THE HONORABLE MARSHA J. PECHMAN

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

KIMBERLY BOTTOMS, on behalf of herself
and all others similarly situated,

Plaintiff,

v.

BLOCK, INC. (F/K/A, SQUARE, INC.)
(D/B/A, CASH APP),

Defendant.

NO. 2:23-cv-01969-MJP

**PLAINTIFF'S OPPOSITION TO
DEFENDANT BLOCK, INC.'S
MOTION TO DISMISS**

**NOTE ON MOTION CALENDAR:**
MARCH 8, 2024

PLAINTIFF'S OPPOSITION TO DEFENDANT BLOCK,
INC.'S MOTION TO DISMISS - 1
CASE NO. 2:23-cv-01969-MJP

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

# TABLE OF CONTENTS

PAGE

I.    INTRODUCTION ........................................................................................................ 1

II.   STATEMENT OF FACTS ......................................................................................... 4

    A.    Block substantially assists the transmission of commercial texts .......................... 4

    B.    Cash App's "Invite Friends" texts are commercial in nature ................................ 5

III.  LEGAL STANDARD ................................................................................................. 7

    A.    Standard on a motion to dismiss ........................................................................... 7

    B.    Both CEMA and the CPA must be liberally construed to protect consumers ........................................................................................................... 7

IV.   ARGUMENT AND AUTHORITY ............................................................................ 8

    A.    Plaintiff plausibly alleges that Block "substantially assisted" the transmission of unlawful commercial marketing texts ......................................... 8

        1.    Plaintiff plausibly alleges that Block enabled users to formulate, compose, send, originate, initiate, or transmit Cash App referral texts ............................................................................................................ 8

        2.    Block "knew or consciously avoided knowing" that Cash App users were sending unsolicited commercial text messages ...................... 11

        3.    Alternatively, Plaintiff plausibly alleges the text initiators were conducting business in Washington ............................................................ 13

    B.    No statutory exception to "assist the transmission" applies to Block's alleged conduct .................................................................................................. 14

    C.    Plaintiff plausibly alleges that the refer-a-friend texts are commercial in nature ................................................................................................................... 17

V.    CONCLUSION ......................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**PAGE(S)**

### FEDERAL CASES

*Adzhikosyan v. Callfire, Inc.*,
    2019 WL 7856759 (C.D. Cal. Nov. 20, 2019)............................................................10

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)........................................................................................................7

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)........................................................................................................7

*Chesbro v. Best Buy Stores, L.P.*,
    705 F.3d 913 (9th Cir. 2012) ...........................................................................18, 19, 20

*De la Cabada v. Ytel, Inc.*,
    2020 WL 1156909 (N.D. Cal. Mar. 10, 2020)...............................................................10

*Frank v. Cannabis & Glass*,
    2019 WL 4855378 (E.D. Wash. Oct. 1, 2019) ...............................................................10

*Gragg v. Orange Cab Co.*,
    2013 WL 195466 (W.D. Wash. Jan. 17, 2013).........................................17, 18, 19, 20

*Hickey v. Voxernet LLC*,
    887 F. Supp. 2d 1125 (W.D. Wash. 2012)..............................................................19, 20

*Lopez v. Smith*,
    203 F.3d 1122 (9th Cir. 2000) .....................................................................................20

*Moore v. Robinhood Financial, LLC*,
    2022 WL 3082969 (W.D. Wash. Aug. 3, 2022)......................................................*passim*

*Northstar Fin. Advisors Inc. v. Schwab Invs.*,
    779 F.3d 1036 (9th Cir. 2015) .......................................................................................7

*Tiedemann v. von Blanckensee*,
    72 F.4th 1001 (9th Cir. 2023) ......................................................................................20

*U.S. v. Corinthian Colleges*,
    655 F.3d 984 (9th Cir. 2011) .......................................................................................20

*Wright v. Lyft, Inc.*,
    2016 WL 7971290 (W.D. Wash. Apr. 15, 2016)...................................................*passim*

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1

**STATE CASES**

2

*Jametsky v. Olsen,*
        179 Wn.2d 756, 317 P.3d 1003 (2014)................................................3, 7, 14

3

*In re Estate of Mower,*
        193 Wn. App. 706, 374 P.3d 180 (2016)....................................................12

4

5

*Panag v. Farmer's Ins. Co. of Wash.,*
        166 Wn.2d 27, 204 P.3d 885 (2009)............................................................7

6

7

*State v. J.P.,*
        149 Wn.2d 444, 69 P.3d 318 (2003)..........................................................15

8

9

**STATUTES**

10

47 U.S.C. § 227 ...............................................................................................1

11

RCW 19.86.920 ..............................................................................................7

12

RCW 19.190.010 ............................................................................................1

13

RCW 19.190.010(1)..................................................................................*passim*

14

RCW 19.190.010(7)......................................................................................11

15

RCW 19.190.010(11).....................................................................................13

16

RCW 19.190.020(1)......................................................................................14

17

18

RCW 19.190.060(1)..........................................................................8, 12, 13, 14

19

**OTHER AUTHORITIES**

20

2003 Wash. Legis. Serv. 137, Sec. 1 ...............................................................7

21

Sale, Black's Law Dictionary (9th ed. 2009)..................................................19

22

23

24

25

26

27

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1

## I.    INTRODUCTION

2      Block, Inc. sells electronic financial services through a platform called Cash App. Block

3   is aware that text messages are an effective means of encouraging new customers to use Cash

4   App. But sending marketing text messages risks violating telemarketing laws, including the

5   Telephone Consumer Protection Act, 47 U.S.C. § 227. To advertise its services by text message

6   without running afoul of the TCPA, Block pays its customers to spam their personal contacts

7   with text message advertisements encouraging those contacts to download Cash App, provide

8   their debit card information, and complete a transaction. Block pays its customers $5 for each

9   successful referral. Unfortunately for Block, Washington legislators were aware of the possibility

10  that corporations would use third parties to do what they cannot do themselves—spam people

11  with unsolicited commercial text messages—and  therefore passed the Consumer Electronic Mail

12  Act ("CEMA"), RCW 19.190.010 et seq. CEMA makes it illegal not only for a company to send

13  unsolicited commercial text messages but also to provide "substantial assistance" to someone

14  else to send unsolicited messages on the company's behalf. Thanks to the foresight of

15  Washington's lawmakers, Block's scam is illegal in Washington.

16      Plaintiff Kimberly Bottom received an unsolicited commercial electronic text message on

17  her cell phone inviting her to sign up for Block's Cash App services. The text included a link

18  directing her to Cash App's app or website to create an account and stated: "Hey! I've been

19  using Cash App to send money and spend using the Cash Card. Try it using my code and you'll

20  get $5. FVRJ1PH." She sued Block for violations of CEMA and Washington's Consumer

21  Protection Act ("CPA"), RCW 19.86 et seq., on behalf of a proposed class of Washington

22  residents who also received Block's canned refer-a-friend texts.

23      Block now moves to dismiss Plaintiff's claims. In a continuing effort to evade liability

24  for its effort to circumvent federal law, Block asks the Court to adopt an interpretation of CEMA

25  that would eviscerate the broad protections from unsolicited commercial text messages the

26  legislature intended CEMA to provide. Many of Block's arguments were recently rejected in

27  *Moore v. Robinhood Financial, LLC*, 2022 WL 3082969 (W.D. Wash. Aug. 3, 2022) (Rothstein,

PLAINTIFF'S OPPOSITION TO DEFENDANT BLOCK,
INC.'S MOTION TO DISMISS - 1
CASE NO. 2:23-cv-01969-MJP

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

J.). In *Moore*, the court held the plaintiffs adequately pleaded that the defendant violated CEMA by conducting a nearly identical refer-a-friend text message scheme. Block urges the Court to reject the reasoning in *Moore* but fails to provide an adequate basis for doing so. The Court should follow *Moore* and deny Block's motion for four reasons.

First, as in *Moore*, Block violated Washington law by substantially assisting its users in sending text messages marketing Cash App. CEMA defines "substantial assistance or support" to include actions that enable any person to formulate, compose, send, originate, initiate, or transmit commercial text messages. RCW 19.190.010(1). Plaintiff alleges that Block provides "substantial assistance or support" as defined by CEMA by (a) paying its users to send referral messages; (b) composing the advertising text messages and providing them to its users; (c) supplying its users with unique user-specific referral links that the text recipients—the user's friends and family—can use to create a Cash App account; and (d) enabling its users to send the text messages through functionality contained in the Cash App itself. Dkt. 1-2 (Complaint) ¶ 32. These detailed allegations more than suffice to state a claim under the CEMA.

Second, the text initiators (the Cash App users) are not required to themselves violate the statute for Block to be liable. The text initiators therefore do not have to "conduct business" in Washington. CEMA requires only that *Block* conduct business in Washington, substantially assist in the transmission of the texts, and "know or consciously avoid knowing" that the initiators are engaging "in any practice that violates the consumer protection act," i.e., sending the texts without obtaining recipients' clear and affirmative consent in advance. RCW 19.190.010(1). The interpretation that Block urges the Court to adopt would undermine the remedial purposes of both the CEMA and CPA, which is to protect consumers from scams like Block's, and would allow a Washington defendant to avoid liability simply by associating with an out-of-state service to send its spam text messages. *See Moore*, 2022 WL 3082969, at *4 (rejecting argument that defendant could only be liable for violating CEMA if the text initiators were conducting business in Washington as "based on a deliberate misconstruction of RCW §

1   19.190.010(1) and RCW § 19.190.060(1)" and "inconsistent with the legislature's intent" in

2   enacting CEMA).

3         Third, Block's activities that promote, encourage, and make it easier for users to send

4   unsolicited refer-a-friend text messages to Washington residents do not fall within CEMA's

5   exception for "activities … related to the design, manufacture, or distribution of any technology,

6   product, or component that has a commercially significant use other than to violate or

7   circumvent this section." RCW 19.190.010(1). Plaintiff alleges that Block substantially assists its

8   Cash App users in sending spam text messages by paying them to send the illegal texts,

9   composing the illegal text messages, providing users with personalized links to send to their

10  friends, and then making it easy to earn the $5 by sending the text messages through the app.

11  These "activities" bear no relation to the "design, manufacture, or distribution" of the technology

12  behind Cash App. The only technology that Plaintiff's substantial assistance allegations concern

13  is the independent technology powering Cash App's "Invite Friends" feature—which has no

14  commercially significant use aside from enabling spam text messaging. Broadly interpreting the

15  exemption as Block requests would swallow the rule, protecting from liability every company

16  that uses computers, and is directly contrary to the Washington Supreme Court's requirement

17  that remedial statutes be interpreted broadly to protect the consumers they were intended to

18  protect. *See Jametsky v. Olsen*, 179 Wn.2d 756, 763, 765, 317 P.3d 1003 (2014).

19        Fourth, the texts are commercial in nature because they promote Block's for-profit

20  products and services. Courts have concluded that a message can be "commercial" under CEMA

21  without explicitly mentioning the defendant's products or services. Block generates revenue by

22  soliciting consumers to download the Cash App mobile app, create an account, and link their

23  bank account to their Cash App account. Users can then send and receive money to and from

24  other users, hold money in their Cash App account, and *pay for* and access other Cash App

25  services, such as ATM withdrawals, paper money deposits, instant transfers from their Cash App

26  account to a linked account, and sending money via credit card. *See* Complaint ¶ 24; *Moore*,

27  2022 WL 3082969, at *6 (text messages were "commerical" where complaint identified

PLAINTIFF'S OPPOSITION TO DEFENDANT BLOCK,
INC.'S MOTION TO DISMISS - 3
CASE NO. 2:23-cv-01969-MJP

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1   "specific charges for [defendant's] services"). Indeed, Block does not even allow text recipients

2   or senders to collect the $5 offered in the text messages until the recipient links a bank account to

3   their Cash App account and completes a qualifying transaction.

4          Block's motion should be denied. Should the Court find that any of Plaintiff's allegations

5   are insufficient, Plaintiff respectfully requests leave to amend as this case is in its earliest stages

6   and Block would suffer no prjeudice by allowing amendment.

7                          **II.      STATEMENT OF FACTS**

8   **A.      Block substantially assists the transmission of commercial texts.**

9          Block offers a service called Cash App that allows consumers to access financial

10  services, such as sending and receiving money, through the Cash App website and mobile app.

11  Complaint ¶ 1. To market its products and services, Block created a referral program for Cash

12  App called "Invite Friends." *Id.* ¶ 2. Block encourages Cash App users to refer their contacts to

13  its service by compensating users for each successful referral. *Id.* Under the current incentives

14  offered by the program, when a referral recipient signs up for Cash App, enters a referral code,

15  links their bank account or debit card, and sends a "qualifying payment" of at least $5, both the

16  referring user and the referred contact receive a bonus of $5. The link expires within 14 days. *Id.*

17  Block has offered even higher incentives for referring Cash App users in the past. *Id.*

18         Cash App's Invite Friends marketing program relies on the transmittal of commercial text

19  messages for its success. Block assists Cash App users in transmitting commercial text messages

20  in several crucial ways, including by encouraging and paying users to send successful referrals

21  and making it easy for users to send the texts with just a few taps. All the user has to do is tap

22  "Invite Friends" in the Cash App mobile app, which then populates a list of the user's phone

23  contacts, and then tap a "Get $5" button next to the contact the user wants to refer. *Id.* ¶¶ 3, 26-

24  29. The user does not select the method by which to send the referral—the Cash App

25  automatically determines to send a text message when the user taps "Get $5." *Id.* The pre-

26  composed, pre-addressed text message includes an invitation to join Cash App in exchange for

27  the promise of $5 for both the contact and referring user, and a unique referral link that allows

PLAINTIFF'S OPPOSITION TO DEFENDANT BLOCK,
INC.'S MOTION TO DISMISS - 4
CASE NO. 2:23-cv-01969-MJP

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

Cash App to identify the sender of the message. *Id.* ¶ 30. The user does nothing more than hit send. *Id.* ¶ 31. The Cash App mobile app also prompts users to send referrals by displaying alerts within the app reminding them to "Invite Friends" to earn $5 referral bonuses. *Id.*

Refer-a-friend marketing like Cash App's "Invite Friends" program is a way for companies to mass market their services via text message without directly spamming consumers themselves; instead, companies assist their users in spamming consumers and pay them to do so. *Id.* Block knows its Cash App users are seeking payment through the "Invite Friends" program for referring Washington residents to Cash App by text message. *Id.* ¶ 34. Block uses this payment incentive to encourage its users to send referrals to as many people as possible. *Id.* ¶ 25. Block does not obtain consumers' clear and affirmative consent in advance to receive Cash App referral text messages. *Id.* ¶ 34. Nor does Block require Cash App users to obtain recipients' consent or employ any controls in the Cash App mobile app to ensure that users obtain recipients' consent. *Id.* ¶ 35. Block thus knows or consciously avoids knowing whether Cash App users send the commercial marketing text messages without obtaining recipients' clear and affirmative consent in advance.

Plaintiff resided in Washington State when she received unsolicited commercial text messages inviting her to sign up for Cash App. *Id.* ¶ 39. The texts Plaintiff received contained Block's pre-composed, standardized language and a link directing her to download the Cash App mobile app and create an account. *Id.* Plaintiff did not provide clear and affirmative consent in advance to receive the text messages. *Id.* ¶¶ 41, 42.

**B.    Cash App's "Invite Friends" texts are commercial in nature.**

In 2022, Cash App earned $10.6 billion in revenue. *Id.* ¶ 1. Block describes Cash App as:

> [a]n ecosystem of financial products and services to help individuals manage their money by providing financial tools that allow individuals to store, send, receive, spend, save and invest their money. Cash App seeks to redefine the world's relationship with money by making it more relatable, instantly available, and universally accessible.

*Id.* ¶ 10.

PLAINTIFF'S OPPOSITION TO DEFENDANT BLOCK, INC.'S MOTION TO DISMISS - 5
CASE NO. 2:23-cv-01969-MJP

TERRELL MARSHALL LAW GROUP PLLC
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

The text messages that Block helps Cash App users send to their contacts encourage recipients like Plaintiff to use Cash App to send and spend money using its Cash Card. *Id.* ¶ 39. Block depends on consumers creating Cash App accounts, linking their bank accounts, completing transactions within the app, and purchasing services to generate revenue. *Id.* ¶ 22 ("Future revenue growth depends on our ability to retain existing sellers and customers, attract new sellers and customers, and ***increase sales*** to both new and existing sellers and customers." (emphasis added)). Block pays its users to recruit additional Cash App users to drive revenues. *Id.* ¶ 25. Currently, Block offers a $5 "referral bonus" to both the referring user and the referred contact. To receive the bonus, the referred contact must create a Cash App account using the unique link contained in the referral text, link their debit card or bank account, and make a qualifying payment within 14 days. *Id.* ¶ 23.

While Cash App users can send and receive money at no cost, using the app is not free. *Id.* ¶ 1. As Cash App states in its Terms of Service, "as consideration for your use of [Cash App], you irrevocably transfer and assign to the Company all of your rights in any and all interest paid by our partner bank on your Cash App Balance and your Savings Balance funds that are held by the Company on your behalf." Terms of Service § VI.6.[1] In other words, Cash App users must pay to use Cash App by giving Block the interest on any amounts in their Cash App accounts. Cash App users also must pay for additional services. For example, Cash App charges a 3% fee for transactions sent from credit cards and charges a 0.5%-1.75% fee when users immediately transfer funds from their Cash App account to their bank accounts. Cash App also charges ATM withdrawal fees and fees to deposit paper money. Cash App's revenue depends on its ability to charge users these fees. Complaint ¶ 24.

---

[1] Cash App Terms of Service ("Terms of Service"), https://cash.app/legal/us/en-us/tos); *see also* Complaint ¶ 24 n.11 (citing Terms of Service).

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1

## III.    LEGAL STANDARD

2

**A.    Standard on a motion to dismiss.**

3    "To survive a motion to dismiss, a complaint must contain sufficient factual matter,

4    accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556

5    U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is

6    facially plausible "when the plaintiff pleads factual content that allows the court to draw the

7    reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*,

8    550 U.S. at 556). The Court must "accept factual allegations in the complaint as true and

9    construe the pleadings in the light most favorable to the non-moving party." *Northstar Fin.*

10   *Advisors Inc. v. Schwab Invs.*, 779 F.3d 1036, 1042 (9th Cir. 2015).

11   **B.    Both CEMA and the CPA must be liberally construed to protect consumers.**

12   The Washington legislature's goal in enacting CEMA was to "limit the practice of

13   sending unsolicited commercial text messages to cellular telephone or pager numbers in

14   Washington." 2003 Wash. Legis. Serv. 137, Sec. 1. The legislature recognized "that the number

15   of unsolicited commercial text messages sent to cellular telephones and pages is increasing" and

16   that the practice was raising "serious concerns on the part of cellular telephone and pager

17   subscribers." *Id.* CEMA should be interpreted to further this purpose.

18   The Washington Supreme Court requires courts to "construe remedial statutes liberally in

19   accordance with the legislative purpose behind them" and "in favor of the consumers they aim to

20   protect." *Jametsky*, 179 Wn.2d at 763, 765; *see also Wright v. Lyft, Inc.*, 189 Wn.2d 718, 724-26,

21   406 P.3d 1149 (2017) ("*Wright II*") (describing the legislative history and purpose of CEMA).

22   The Washington CPA is a remedial statute designed to deter unfair or deceptive acts or practices

23   in the conduct of any trade or commerce, protect the public, and "foster fair and honest

24   competition." RCW 19.86.920; *Panag v. Farmer's Ins. Co. of Wash.*, 166 Wn.2d 27, 37, 204

25   P.3d 885 (2009). The CPA is to be "liberally construed that its beneficial purposes may be

26   served." RCW 19.86.920.

27

PLAINTIFF'S OPPOSITION TO DEFENDANT BLOCK,
INC.'S MOTION TO DISMISS - 7
CASE NO. 2:23-cv-01969-MJP

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

IV.    ARGUMENT AND AUTHORITY

**A.    Plaintiff plausibly alleges that Block "substantially assisted" the transmission of unlawful commercial marketing texts.**

Under CEMA, a person conducting business in the state of Washington may not "initiate or assist in the transmission of an electronic commercial text message to a telephone number assigned to a Washington resident for cellular telephone or pager service that is equipped with short message capability or any similar capability allowing the transmission of text messages." RCW 19.190.060(1). The definition of "assist the transmission" is broad. It includes an array of conduct from creation to actual transmission of the message:

> actions taken by a person to provide substantial assistance or support which enables any person to formulate, compose, send, originate, initiate, or transmit a commercial electronic mail message or commercial electronic text message when the person providing the assistance knows or consciously avoids knowing that the initiator of the commercial electronic mail message or the commercial electronic text message is engaged, or intends to engage, in any practice that violates the consumer protection act.

RCW 19.190.010(1).

Block asserts that Plaintiff failed to allege that it provided "substantial assistance or support" in the transmission of a commercial electronic text message. Motion at 5-9. Block ignores Plaintiff's allegations and misconstrues the law.

1.    Plaintiff plausibly alleges that Block enabled users to formulate, compose, send, originate, initiate, or transmit Cash App referral texts.

Plaintiff alleges specific facts showing Block "provided substantial assistance or support" that enabled Cash App users to "formulate, compose, send, originate, initiate, or transmit" the text messages at issue in this case.

Block provides this assistance by (1) paying Cash App users to participate in its referral program (Complaint ¶ 25); (2) deploying an "Invite Friends" feature in the Cash App mobile app that allows users to easily send refer-a-friend texts by clicking on the "Invite Friends" button (*id.* ¶¶ 3, 26); (3) prompting users to select individuals to whom they will send referral texts from their contacts (*id.* ¶¶ 27, 28); (4) composing text messages directed to the users' contacts

PLAINTIFF'S OPPOSITION TO DEFENDANT BLOCK, INC.'S MOTION TO DISMISS - 8
CASE NO. 2:23-cv-01969-MJP

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

containing Cash App marketing content and unique hyperlinks (*id.* ¶ 29); and (5) automatically opening the users' text messaging application containing the pre-composed and pre-addressed text message (*id.*). These facts "satisfactorily allege[] a potential CEMA violation" because Plaintiff has "establish[ed] a chain of events wherein Defendant 'assisted' with the transmission of the invitational text." *Wright v. Lyft, Inc.*, 2016 WL 7971290, at *4 (W.D. Wash. Apr. 15, 2016) ("*Wright I*") (declining to dismiss CEMA claim where plaintiffs alleged similar "refer-a-friend" texts were sent with assistance of defendant's app); *see also Wright II*, 189 Wn.2d at 721 (observing that Lyft's application "invites users to initiate text messages to a user's contacts" and describing the process as "a Lyft user opening the application, clicking on the 'Settings' menu, selecting 'Invite Friends,' then selecting one or multiple individuals from the user's contacts or 'Select All,' and, finally, agreeing to 'Send Invites'").

The plaintiffs in *Moore* alleged very similar facts to support their claim that Robinhood Financial substantially assisted its users in sending refer-a-friend text messages to their contacts through the Robinhood app. *Moore*, 2022 WL 3082969, at *4. The *Moore* court found the plaintiffs' allegations established that "Robinhood developed and ordered the entire 'chain of events' leading to the messages' formulation and transmission" because "the Robinhood App prompts users to refer contacts with the promise of free stocks, pre-composes the messages, and then automatically generates them within the users' cell phone in such a way that enables them to be sent by the users with as few as four total clicks." *Id.* (citation omitted). The court found these allegations stated a CEMA violation. *Id.* Block cannot distinguish the holding in *Moore*.

Block contends that Plaintiff's "assistance" allegations fall short because the text initiators had the ability to edit the text and maintain final control over when and to whom the texts were sent, but "assistance" does not require final editorial control. Plaintiff's allegations outlining the manner in which Block enabled its Cash App users to "formulate, compose, send, originate, initiate, or transmit" the illegal text messages are sufficient to satisfy the definition of "assistance." With CEMA, "whether or not the [app] users had full control over the final messages at the point of their transmission is of no moment insofar as Plaintiff[] do[es] not seek

PLAINTIFF'S OPPOSITION TO DEFENDANT BLOCK,
INC.'S MOTION TO DISMISS - 9
CASE NO. 2:23-cv-01969-MJP

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 ● FAX 206.319.5450
www.terrellmarshall.com

1    to establish that [Block] 'initiated' the messages. Plaintiff[ ], here, seek[s] to prove only that

2    [Block] provided 'substantial assistance or support' to its users in formulating, composing,

3    sending, originating, initiating, or transmitting them." *Moore*, 2022 WL 3082969, at *4.

4         Plaintiff's allegations also are far more robust and detailed than the allegations in *Frank*

5    *v. Cannabis & Glass*, which did not concern a refer-a-friend scheme. 2019 WL 4855378 (E.D.

6    Wash. Oct. 1, 2019). In *Frank*, the plaintiff asserted a per se CPA claim based on alleged CEMA

7    violations against both the retailers who sent the texts and a company called Springbig that

8    provided the texting platform to the retailers. The plaintiff alleged only that Springbig provided a

9    programmable platform to the retailers and included sample text messages on its website. *Id.* at

10   *2-3. The plaintiff did not allege that the retailers used those samples, much less that Springbig

11   programmed the app to prepopulate the messages. Nor did the plaintiffs allege that Springbig

12   knew or consciously avoided knowing that the retailer defendants were engaged in a practice that

13   violated the CPA. *Id.* at *3. On those facts, the court granted Springbig's motion to dismiss the

14   plaintiff's per se CPA claim based on CEMA violations, but gave the plaintiff leave to amend.

15   *See id.* at *3-4.

16        Block's reliance on cases addressing TCPA "involvement" liability is misplaced. CEMA

17   explicitly holds a person liable for unlawful text messages if the person "assists" in formulating,

18   composing, sending, originating, initiating, or transmitting the illegal text messages. The TCPA

19   contains no parallel assistance language. *See Wright I*, 2016 WL 7971290, at *4 ("Unlike the

20   TCPA, it makes no difference [under CEMA] if some other party 'initiated' the text message to

21   Plaintiff by going through the invitational process."). To violate CEMA, Washington law does

22   not require that a person be "so involved in placing the call as to be deemed to have initiated it"

23   as required for a TCPA violation. *De la Cabada v. Ytel, Inc.*, 2020 WL 1156909, at *3 (N.D. Cal.

24   Mar. 10, 2020) (outlining Federal Communications Commission guidance on when an entity

25   "made" a call for purposes of TCPA liability); *see also Adzhikosyan v. Callfire, Inc.*, 2019 WL

26   7856759, at *2 (C.D. Cal. Nov. 20, 2019) (same). The various factors the FCC developed in its

27

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

2015 Ruling to determine whether entities that provide software or platforms to facilitate calling are subject to the TCPA simply do not apply here.

In addition, the TCPA cases Block relies on involved allegations against third-party entities that provided software applications or platforms solely to facilitate calling. Unlike those companies that design, manufacture, and distribute texting or calling platforms, Block does not simply put its texting system into the stream of commerce so that other companies can use the refer-a-friend functionality for their own marketing purposes. Block uses the refer-a-friend function to advertise its *own* product and services. In addition, Block pays its users to send the illegal text messages, writes the text messages for the users, provides the users with a personalized link to send to their friends via the text messages, and then uses functionality within the app to help its users easily send the text messages to their friends and family. Block orchestrates the entire chain of events that results in the spam refer-a-friend text message.

2. Block "knew or consciously avoided knowing" that Cash App users were sending unsolicited commercial text messages.

Plaintiff plausibly alleges that Block assisted in the transmission of the texts because Block "knew or consciously avoided knowing" that the text initiators were "engaged, or intend[ed] to engage, in any practice that violates the consumer protection act." *See* RCW 19.190.010(1) & (7). Plaintiff alleges that Block knows or consciously avoids knowing whether initiators send the texts without obtaining the recipients' clear and affirmative consent in advance. Complaint ¶ 33. Block never informs Cash App users that they should obtain a recipient's clear and affirmative consent to receive the texts, nor does it employ any controls in the app to ensure that users obtain consent before sending the messages. *Id.* ¶¶ 34-35. Block ignores these facts, which, taken as true, show that Block turns a blind eye to whether initiators obtain consent to send the referral texts before sending them.

Block maintains that Plaintiff cannot allege that Block "knew or consciously avoided knowing" that text initiators were "engaged, or intend[ed] to engage, in any practice that violates the consumer protection act," without showing that text initiators themselves violated CEMA

PLAINTIFF'S OPPOSITION TO DEFENDANT BLOCK, INC.'S MOTION TO DISMISS - 11
CASE NO. 2:23-cv-01969-MJP

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1    and were themselves "conducting business in Washington." RCW 19.190.060(1). Block

2    misconstrues the text of the statute to inject a requirement that does not exist. *See Moore*, 2022

3    WL 3082969, at *4 (rejecting the same "crafty" argument because it "is based on a **deliberate**

4    **misconstruction** of RCW § 19.190.010(1) and RCW § 19.190.060(1)" (emphasis added)).

5         A CEMA violation may be proven by showing that either the person initiating the text

6    message *or* the person "assisting in the initiation" of the text message is conducting business in

7    Washington. RCW 19.190.060(1). Plaintiff alleges that Block, doing business as Cash App,

8    conducts business in the state, satisfying this requirement. Complaint ¶ 14.

9         For a claim alleging a company provided "substantial assistance" in sending illegal text

10   messages, CEMA requires plaintiffs to allege that the initiator of the texts "is engaged, or intends

11   to engage, **in any practice** that violates the CPA." RCW 19.190.010(1) (emphasis added). To

12   "engage in" means to "take part in something." Cambridge Online Dictionary,

13   https://dictionary.cambridge.org/us/dictionary/english/engage-in-sth. The statute thus requires

14   Plaintiff to prove that initiators "took part in" *Block's* CEMA violations. *See Moore*, 2022 WL

15   3082969, at *4 ("RCW § 19.190.010(1) requires Plaintiffs to establish only that the assister

16   (Robinhood) knew that the initiators (the users who sent the invitational messages) intended to

17   take part in a practice that would result in a CEMA violation."). Plaintiff alleges that the

18   initiators "engaged in" a "practice" that violates the CPA—the sending of unsolicited

19   commercial text messages to Washington residents. Block's proposed interpretation that Plaintiff

20   must allege that the initiators themselves violated the statute reads these words out of the

21   statutory text, impermissibly rendering them superfluous. *In re Estate of Mower*, 193 Wn. App.

22   706, 720, 374 P.3d 180 (2016) ("the rule against surplusage, which requires this court to avoid

23   interpretations of a statute that would render superfluous a provision of the statute." (quoting *Veit*

24   *ex rel. Nelson v. Burlington N. Santa Fe Corp.*, 171 Wn.2d 88, 113, 249 P.3d 607 (2011))).

25        It would be counter to the intent of the CPA and CEMA if corporations conducting

26   business in Washington, such as Block, could violate the statutes but escape liability simply by

27   paying entities located outside the state to send texts on their behalf. The entire purpose behind

PLAINTIFF'S OPPOSITION TO DEFENDANT BLOCK,
INC.'S MOTION TO DISMISS - 12
CASE NO. 2:23-cv-01969-MJP

1  CEMA's "assistance" language is to prevent precisely this kind of outsourcing. Interpreting

2  CEMA to allow a company doing business in Washington to recruit consumers to do its dirty

3  work is also contrary to the remedial purpose of the statute and the legislature's intent. Block's

4  convoluted, anti-consumer interpretation should be rejected. *See Moore*, 2022 WL 3082969, at

5  *5 ("RCW § 19.190.060(1) requires [plaintiffs] to allege only that [defendant] – and not the

6  users who sent [plaintiffs] the invitational messages – had been conducting business in

7  Washington").

8        3.      Alternatively, Plaintiff plausibly alleges the text initiators were conducting
                 business in Washington.
9

10       The plain language of CEMA does not require Plaintiff to allege that the text initiators

11  also violated CEMA and were "conducting business" in Washington. But if the Court disagrees,

12  Plaintiff's allegations suffice. Plaintiff alleges that Block pays text initiators for each

13  successfully referred contact with a $5 "referral bonus." Complaint ¶¶ 2, 3, 23, 25. The intent of

14  the initiators is reasonably inferred from the button they must press to send a referral, which is

15  labeled "Get $5." *Id.* ¶ 28. Moreover, the text of the messages, drafted by Block, encourages

16  recipients like Plaintiff to use the initiator's personalized link so that both the recipient and the

17  initiator will automatically receive the referral bonus once the recipient creates a Cash App

18  account, links their debit card, and completes a minimum $5 transaction in the app. *Id.* ¶¶ 2, 3,

19  23, 25; *see also id.* ¶ 30 (texts include unique referral links that "allows Cash App to identify the

20  sender of the message"). The initiators are therefore "conducting business" by seeking to earn a

21  commission when they direct a commercial text message to Washington residents. The plain

22  meaning of "conduct business" indisputably includes these alleged activities. There is simply no

23  basis for Block's purported concern that this interpretation would risk sweeping in any text to a

24  friend that speaks favorably of a product or service.

25       Block's arguments misconstrue the statute's plain text. CEMA's text message

26  prohibitions apply not just to businesses but to "persons"—which is expressly defined to include

27  "individuals." RCW 19.190.010(11). Other CEMA provisions, such as the prohibitions on

1    unpermitted and misleading email, also apply to "persons" and are similarly not limited to

2    businesses. RCW 19.190.020(1). The legislature clearly contemplated that individuals, in

3    addition to businesses, could be liable for $500 in statutory damages for violations of the law.

4         Applying the law to individuals who send text messages to Washington residents in

5    violation of the law and in exchange for payment or the possibility of payment does not render

6    the language "conducting business" surplusage. The phrase still serves its purpose in limiting

7    application of the law to the jurisdictional bounds of the state. RCW 19.190.060(1) (prohibiting

8    "person[s] conducting business in the state" from sending or assisting in sending commercial text

9    messages "to a telephone number assigned to a Washington resident"). CEMA's email

10   prohibitions include a similar jurisdictional limitation to messages sent "from a computer located

11   in Washington or to an electronic mail address that the sender knows, or has reason to know, is

12   held by a Washington resident." RCW 19.190.020(1).

13        In short, there is simply no requirement that the initiator of the text message be engaged

14   in an independent violation of CEMA. But even there was, Plaintiff has sufficiently alleged that

15   the initiators do conduct business in Washington by sending these specific text messages and

16   because of their Washington-based customer relationship with Cash App. Either way, *Block* is

17   accountable for the unlawful marketing scheme that it created and substantially assists in

18   implementing—an outcome that is consistent with the legislative directive to construe CEMA

19   and the CPA "in favor of the consumers they aim to protect." *Jametsky*,179 Wn.2d at 765.

20   **B.    No statutory exception to "assist the transmission" applies to Block's alleged**
21   **conduct.**

22        CEMA identifies two categories of activities that do not constitute "assisting the

23   transmission":

24        (a) Activities of an electronic mail service provider or other entity who
         provides intermediary transmission service in sending or receiving
25       electronic mail, or provides to users of electronic mail services the ability to
         send, receive, or compose electronic mail; or (b) activities of any entity
26       related to the design, manufacture, or distribution of any technology,
         product, or component that has a commercially significant use other than to
27       violate or circumvent this section.

PLAINTIFF'S OPPOSITION TO DEFENDANT BLOCK,                    **TERRELL MARSHALL LAW GROUP PLLC**
INC.'S MOTION TO DISMISS - 14                                936 North 34th Street, Suite 300
CASE NO. 2:23-cv-01969-MJP                                   Seattle, Washington  98103-8869
                                                             TEL. 206.816.6603 • FAX 206.319.5450
                                                             www.terrellmarshall.com

1  RCW 19.190.010(1). Neither category applies to Block.

2        The first exception does not apply because Block is not a mere electronic mail service

3  provider or the developer or distributor of the technology used to send its marketing texts. The

4  second exception does not apply because Plaintiff does not allege that Block "assisted the

5  transmission" of the text messages through any activities relating to the "design" or

6  "manufacture" or "distribution" of the "Invite Friends" technology. Plaintiff alleges that Block

7  "assisted the transmission" by, *inter alia*, "encouraging and incentivizing its users to send

8  referral messages by compensating them with money;" enabling users to easily send refer-a-

9  friend text messages; composing text messages for its users to send; and creating user-specific

10  referral links that recipients can use to sign up for Cash App. Complaint ¶ 32. The crux of

11  Plaintiff's claims is that Block *used* technology embedded in the Invite Friends sections of the

12  app to conduct these non-exempt activities. Under the plain language of the statute, the exception

13  does not apply.

14        Upon close examination, Block's arguments that the exception applies actually support

15  Plaintiff's position. For example, Block asserts that Plaintiff's Complaint "predicates its

16  assistance liability claim on Block's 'activities' related to the 'Invite Friends' feature of its Cash

17  App mobile application, i.e. the technology and product designed by Block." Motion at 13:11-13.

18  Block does not assert, nor could it, that Plaintiff predicates her assistance liability claim on

19  Block's activities related to the ***design, manufacture, or distribution*** of the "Invite Friends"

20  feature. Motion at 13:17-18 (discussing "Block's activities related to its mobile application").

21  Block improperly reads those key words out of the statute. *See State v. J.P.*, 149 Wn.2d 444, 450,

22  69 P.3d 318 (2003) ("Just as we 'cannot add words or clauses to an unambiguous statute when

23  the legislature has chosen not to include that language,' … we may not delete language from an

24  unambiguous statute: 'Statutes must be interpreted and construed so that all the language used is

25  given effect, with no portion rendered meaningless or superfluous.'" (citations omitted)).

26  Plaintiff's allegations may relate to Block's use of the Invite Friends feature of the Cash App, but

27  she does not allege that Block substantially assisted its users in sending text messages through

PLAINTIFF'S OPPOSITION TO DEFENDANT BLOCK,
INC.'S MOTION TO DISMISS - 15
CASE NO. 2:23-cv-01969-MJP

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1    activities related to the design, manufacture, or distribution of the app. The exemption does not

2    apply and it therefore does not matter whether Cash App, as a whole, has a commercially

3    significant use apart from violating CEMA or the CPA.

4         Even if Plaintiff's allegations were limited to Block's use of the Invite Friends feature of

5    Cash App (and they are not), Block's argument also fails because Cash App's financial services

6    are irrelevant to Plaintiff's allegations that Block substantially assisted the transmission of spam

7    text messages. Plaintiff does not allege that the Cash App mobile app *as a whole* assists Cash

8    App users in transmitting commercial marketing texts. The technology underlying the Invite

9    Friends feature of the app is entirely independent from the technology in Cash App that provides

10   financial services to users. *See*, *e.g.*, Complaint ¶¶ 26-29 (reflecting that the Invite Friends

11   feature is separate from the financial services offered in Cash App). Block's position that the

12   product as whole should be considered when assistance allegations concern only one feature of

13   the product would create a gaping loophole in the statute by immunizing any entity that markets

14   a technology or product (such as an app) designed with separate components, one of which is

15   designed to violate the CEMA.

16        Block's activities specific to the Invite Friends feature of the Cash App mobile app do not

17   fall within the exception. Not only do Plaintiff's allegations not concern the "design" or

18   "manufacture" or "distribution" of this feature, Plaintiff's allegations make clear that the only

19   purpose and function of the Invite Friends feature is to recruit new Cash App users via

20   unsolicited text messages. The "Invite Friends" button takes Cash App users directly to the

21   screen where users can select contacts, and when a user clicks "Get $5" next to a contact's name,

22   Cash App automatically creates a pre-composed, pre-addressed text message directed to that

23   contact. Complaint ¶¶ 26-31. Thus, the Invite Friends feature of Cash App has no commercially

24   significant use other than to send unsolicited, commercial marketing text messages.

25        Block's misreading of Plaintiff's allegations and the scope of this statutory exception

26   should be rejected.

27

PLAINTIFF'S OPPOSITION TO DEFENDANT BLOCK,
INC.'S MOTION TO DISMISS - 16
CASE NO. 2:23-cv-01969-MJP

1  **C.      Plaintiff plausibly alleges that the refer-a-friend texts are commercial in nature.**

2          The spam referral text message that Plaintiff received promoted Block's for-profit

3  financial services. This text message is a "commercial electronic text message," which CEMA

4  defines as "an electronic text message sent to promote real property, goods, or services for sale

5  or lease." RCW 19.190.010.

6          Courts have held that to be "commercial" in nature, a message need not solicit money,

7  require payment, or even mention a service for which payment is required—it need only be

8  designed to promote a defendant's for-profit services. *See Gragg v. Orange Cab Co.*, 2013 WL

9  195466, at *4 (W.D. Wash. Jan. 17, 2013) ("prohibiting unsolicited text messages that purport to

10  offer a 'free' download or link designed to result in future purchases comports with the

11  legislative findings and intent in enacting CEMA"); *Wright I*, 2016 WL 7971290, at *5 (referral

12  text sent to Lyft's customers' contacts was "commercial" where Lyft designed the text, which

13  offered a free $25 Lyft ride, so that recipients "would use their free app to access their for-profit

14  services"); *Moore*, 2022 WL 3082969, at *5 ("it is sufficient under CEMA that the message be

15  designed to promote, or otherwise have the purpose of promoting, future sales of some good or

16  service"). The statute thus "regulate[s] communications that promote or encourage commercial

17  transactions" and a "direct and immediate sale need not be in the offing to trigger [CEMA]."

18  *Gragg*, 2013 WL 195466, at *4 (text offering free download or link to the defendant's taxi

19  service app that was designed to result in future purchases was a commercial text under the

20  CEMA).

21          Plaintiff plausibly alleges that the Cash App referral texts are commercial in nature. The

22  text messages urge consumers to download and try Cash App, "an ecosystem of financial

23  products and services" that enables users to "store, send, receive, spend, save and invest their

24  money." Complaint ¶ 10. While users can send and receive money without charge, Block

25  generates revenue by charging various fees to users of its services and by requiring users to sign

26  over their ownership right to interest earned by their funds. *Id.* ¶ 24; Terms of Service § VI.6.

27  The text message recipients can download the Cash App mobile app for free, but they must link a

PLAINTIFF'S OPPOSITION TO DEFENDANT BLOCK,
INC.'S MOTION TO DISMISS - 17
CASE NO. 2:23-cv-01969-MJP

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1    debit card to their account and then send a "qualifying payment" of at least $5 in order to receive

2    the offered referral bonus. *Id.* ¶ 23. By encouraging people to "try" Cash App and requiring that

3    they link a debit card, Block intends for the recipients to subsequently use Cash App's various

4    features and services to manage their money. *See Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913,

5    915-18 (9th Cir. 2012) (applying a "measure of common sense" to hold that automated telephone

6    calls advising customers about changes to defendant's rewards program were "commercial"

7    because the point of the calls was to encourage recipients to make future purchases at the

8    defendant's stores); *Moore*, 2022 WL 3082969, at *6 (holding that referral text messages were

9    commercial because their purpose was to promote Robinhood's "commission-free" brokerage

10   service but users paid for the service indirectly by executing trades at inflated prices due to

11   Robinhood's business model).

12         Block offers two reasons why the Court should not reach the commonsense conclusion

13   that the refer-a-friend text messages "promoted future commercial transactions," triggering

14   CEMA. *Gragg*, 2013 WL 195466, at *4. Neither reason is persuasive and both should be

15   rejected.

16         First, Block asserts that because it does not charge users to download the Cash App

17   mobile app or to use it for the basic function of sending and receiving money, there is no service

18   being sold and the texts are therefore not "commercial." Block's assertion is contradicted by

19   Plaintiff's allegations and the Cash App Terms of Service. Plaintiff alleges that "[w]hile Cash

20   App allows users to send and receive money at no cost, once a consumer becomes a Cash App

21   user they must pay for additional services." Complaint ¶ 1. Plaintiff's allegations are confirmed

22   by the Cash App Terms of Service, which are cited in the Complaint and which Block relies on

23   for its assertion. Motion at 15. The Terms of Service require users to provide Block

24   "consideration" for using its service by giving Block the right to any interest earned on the

25   money in users' Cash App accounts. Terms of Service § IV.6. For example, money is held in a

26   user's Cash App account after they receive a "free" transfer from another user or completes a

27   "free" direct deposit. Users therefore promise "a price in money"—interest on any sums in their

accounts—to Block in exchange for using Cash App's "core services." *Hickey v. Voxernet LLC*, 887 F. Supp. 2d 1125, 1128 (W.D. Wash. 2012) (defining "sale" to include "a price in money paid or promised" (quoting Sale, Black's Law Dictionary (9th ed. 2009))). While the ultimate amount that users pay to Block varies based on how long and how much money the user maintains in their Cash App account, users "must" pay this price. Complaint ¶ 1.

Second, Block argues that the texts are not "commercial" because they do not specifically promote the services that cost money and those services are optional. But "[n]either the statute nor the regulations require an explicit mention of a good, product, or service where the implication is clear from the context." *Wright I*, 2016 WL 7971290, at *5 (quoting *Chesbro,* 705 F.3d at 918); *Moore*, 2022 WL 3082969, at *5 ("Plaintiffs clearly plead that the invitational messages were not designed to encourage new users simply to download the Robinhood App, collect their free stock, and then sit idly by").

The fact that a Cash App user's purchase of additional for-payment services is optional does not mean that Block's referral text messages are not commercial in nature. Several courts have found that text messages offering a "free" incentive to entice the recipient to sign up for the defendant's service or download its app to facilitate future *optional* transactions are commercial text messages for purposes of CEMA liability. *See, e.g.*, *Wright I*, 2016 WL 7971290, at *5 (finding referral text was commercial where it offered a free $25 Lyft ride and future purchases were optional); *Gragg*, 2013 WL 195466, at *4 (text offering free download for defendant's taxi service app was commercial where future purchases of taxi rides were optional but the text was designed to result in future purchases). Block's text messages encourage recipients to "try" Cash App's "ecosystem of financial products and services," which include products and services that require payment of fees or interest to Block.

These allegations distinguish this case from *Hickey*, where the text messages promoted a free software application that transformed a user's cell phone into a walkie-talkie. 887 F. Supp. 2d at 1128. But the defendant did not charge consumers for any services and the plaintiff did not allege that users paid any money. *Id.* at 1132. All the plaintiff could point to was non-monetary

PLAINTIFF'S OPPOSITION TO DEFENDANT BLOCK,
INC.'S MOTION TO DISMISS - 19
CASE NO. 2:23-cv-01969-MJP

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington  98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

consideration and the possibility the defendant could decide to charge for services in the future, which the court found to be insufficient evidence of that text messages were commercial in nature. *Id.* at 1132. By contrast, Plaintiff alleges that Block is extracting monetary consideration from users and charging them for services. These allegations suffice to show that the text messages are commercial. *See Wright I*, 2016 WL 7971290, at *5 (distinguishing *Hickey* because "there was no sale of a product or services to promote," while defendant Lyft intended that referred contacts "would use their free app to access their for-profit services"); *Gragg*, 2013 WL 195466, at *4 ("The Ninth Circuit [in *Chesbro*] determined that, contrary to the holding in *Hickey*, a direct and immediate sale need not be in the offing to trigger the WADAD. The Court finds that the same analysis should apply under CEMA.").

Block generates billions of dollars in revenue each year by collecting interest on money held in Cash App and charging users fees. Complaint ¶¶ 1, 22, 24. As in *Wright* and *Moore*, the purpose of Block's texts is to encourage referred contacts to join Cash App, purchase services that require payment of fees, and hold money that will generate interest Block is entitled to collect. The text messages are commercial in nature.

**C.   Alternatively, Plaintiffs should be granted leave to amend.**

If the Court dismisses any of Plaintiff's claims, leave to amend should be granted. "Leave to amend should be granted if it appears at all possible that the plaintiff can correct the defect." *Tiedemann v. von Blanckensee*, 72 F.4th 1001, 1011 (9th Cir. 2023) (citing *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (en banc)). Allowing Plaintiff to amend would not prejudice Block or cause undue delay or be futile, and Plaintiff has not acted in bad faith. *See U.S. v. Corinthian Colleges*, 655 F.3d 984, 995 (9th Cir. 2011). Plaintiff will amend the Complaint to address any deficiencies the Court may find.

## V.   CONCLUSION

For all the foregoing reasons, Plaintiff respectfully requests the Court deny Block's motion to dismiss, or in the alternative, grant leave to amend the Complaint.

PLAINTIFF'S OPPOSITION TO DEFENDANT BLOCK,
INC.'S MOTION TO DISMISS - 20
CASE NO. 2:23-cv-01969-MJP

**TERRELL MARSHALL LAW GROUP PLLC**
936 North 34th Street, Suite 300
Seattle, Washington 98103-8869
TEL. 206.816.6603 • FAX 206.319.5450
www.terrellmarshall.com

1

RESPECTFULLY SUBMITTED AND DATED this 23rd day of February, 2024.

2

TERRELL MARSHALL LAW GROUP PLLC

3

*I certify that this memorandum contains 7,364*

4

*words, in compliance with the Local Civil Rules.*

5

By: /s/ Jennifer Rust Murray, WSBA #36983

6

Beth E. Terrell, WSBA #26759
Email: bterrell@terrellmarshall.com

7

Jennifer Rust Murray, WSBA #36983
Email: jmurray@terrellmarshall.com

8

Eden B. Nordby, WSBA #58654
Email: enordby@terrellmarshall.com

9

936 North 34th Street, Suite 300
Seattle, Washington 98103

10

Telephone: (206) 816-6603

11

Sophia M. Rios, *Admitted Pro Hac Vice*

12

Email: srios@bm.net
BERGER MONTAGUE PC

13

401 B Street, Suite 2000
San Diego, California 92101

14

Telephone: (619) 489-0300

15

E. Michelle Drake, *Admitted Pro Hac Vice*

16

Email: emdrake@bm.net
BERGER MONTAGUE PC

17

43 SE Main Street, Suite 505
Minneapolis, MN 55414

18

Telephone: (612) 594-5933

19

Mark B. DeSanto, *Pro Hac Vice Forthcoming*

20

Email: mdesanto@bm.net
BERGER MONTAGUE PC

21

1818 Market Street, Suite 3600
Philadelphia, PA 19103

22

Telephone: (215) 875-3046

23

*Attorneys for Plaintiff and Proposed Class*

24

25

26

27

PLAINTIFF'S OPPOSITION TO DEFENDANT BLOCK,
INC.'S MOTION TO DISMISS - 21
CASE NO. 2:23-cv-01969-MJP